17-449

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| GREGORY B. MYERS | * | |
| | * | Case No.  15-26033 WIL |
| Debtor. | * | (Chapter 7) |
| | * | |
| _____ | * | |
| | * | |
| GREGORY B. MYERS | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Adversary Proceeding No. _____ |
| | * | |
| BANK OF AMERICA, N.A. | * | |
| Attention: Bankruptcy Department | * | |
| (MAC#D3347-014) | * | |
| 3476 Stateview Boulevard | * | |
| Fort Mill, SC 29715 | * | |
| | * | |
| Serve: Douglas B. Riley, Esq. | * | |
| Treanor Pope & Hughes, P.A. | * | |
| 500 York Road | * | |
| Towson, Maryland 21204 | * | |
| Attorneys for Bank of America, N.A. | * | |
| | * | |
| Defendant. | * | |
| _____ | * | |

## COMPLAINT

COMES NOW the Plaintiff, GREGORY B. MYERS ("Myers" or "Plaintiff"), *pro se*, and

files this Complaint (the "Complaint") against the Defendant, BANK OF AMERICA, NATIONAL

ASSOCIATION ("Bank of America" or "Defendant"), and for cause does allege as follows:

### PARTIES

1

1.     Plaintiff is a natural person who is a resident of the State of Florida.

2.     Defendant is a corporation organized and existing under the laws of the State of Delaware.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this proceeding under 28 U.S.C § 1334.

4.     Venue is proper in this district because a substantial part of the conduct, events and omissions giving rise to the claims occurred within this District.

## FACTS

5.     On July 23, 2004, Myers and Barbara Ann Kelly ("Kelly") executed a Credit Agreement and Disclosure with AmSouth Bank (the "AmSouth Credit Agreement"), together with a Mortgage (the "AmSouth Mortgage") securing real property commonly known as 147 Silver Laurel Way, Santa Rosa Beach, FL 32459. The AmSouth Mortgage was recorded on August 10, 2004 in the official records of Walton County, Florida at Book 2625, Page 4405. A copy of the AmSouth Mortgage is attached hereto as **Exhibit A**.

6.     On May 23, 2005, Wells Fargo Bank, N.A. ("Wells Fargo") issued a "Commitment Letter" (the "Wells Fargo Commitment Letter") for an $875,300.00 loan, Loan Number 0144635299 (the "Wells Fargo Loan") for "Property Address: 147 Silver Laurel Way, Santa Rosa Beach, FL 32459" (the "Property"). The Wells Fargo Commitment Letter is "Signed: WELLS FARGO BANK, N.A.." A copy of the Wells Fargo Commitment Letter is attached hereto as **Exhibit B**.

7.     The Wells Fargo Commitment Letter, *inter alia*, states:

> **EXISTING LIENS** Unless otherwise provided in the specific conditions section of this commitment, any and all existing liens on the property must be paid in full at closing.

2

***

## CONDITIONS OF LOAN APPROVAL (Cont'd)

The following conditions must be satisfied <u>at the time of loan closing</u>:

  o   Payoff all existing liens on the subject property.

8.      On May 25, 2005, in connection with the Wells Fargo Loan, Kelly executed an Adjustable Rate Note (the "Wells Fargo Note"), and Kelly and Myers executed a Mortgage (the "Wells Fargo Mortgage") in favor of Wells Fargo. The Wells Fargo Mortgage was recorded on May 27, 2005 in the official records of Walton County, Florida at Book 2671, Page 3627. A copy of the Wells Fargo Mortgage is attached hereto as **Exhibit C**.

9.      The Wells Fargo Mortgage provides " 'Borrower' is BARBARA ANN KELLY AND GREGORY B MYERS, WIFE AND HUSBAND." The Wells Fargo Mortgage further provides in Paragraph 13:

> [A]ny Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument, and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

10.      Myers executed the Wells Fargo Mortgage in reliance on the contractual conditions precedent set forth in the Wells Fargo Commitment Letter being satisfied, including that "any and all existing liens on the property must be paid in full at closing."

11.      The Wells Fargo Loan closed on May 25, 2005. The Settlement Statement reflects the following:

3

| Line 103. | Settlement Charges to Borrower | $14,458.60 |
| Line 104. | Payoff 1st Mortgage Wells Fargo Home Loans | $393,186.88 |
| Line 202. | Principal Amount of New Loan | $875,300.00 |
| Line 303. | Cash to Borrower | $475,225.87 |

12.      When the Wells Fargo Loan closed on May 25, 2005, Wells Fargo failed to pay off the AmSouth Credit Agreement secured by the AmSouth Mortgage - one of the "existing liens on the subject property."

13.      On June 28, 2006, the Wells Fargo Loan was sold to Bank of America. By operation of law, Bank of America accepts all of the benefits and burdens of the Wells Fargo Loan, i.e. "stepping into the shoes" of Wells Fargo with respect to all of the benefits and burdens of the Wells Fargo Loan.

14.      On September 12, 2011, Regions Bank[1] sued Myers and Kelly in Montgomery County Circuit Court for "account stated" in connection with the AmSouth Credit Agreement.[2] The case was removed to the United States District Court for the Northern District of Florida, where Regions Bank ultimately obtained a judgment against Myers and Kelly on February 27, 2014 in the amount of $580,325.22 (the "Regions Bank Judgment"). A copy of the Regions Bank Judgment is attached hereto as **Exhibit D**.

15.      On December 7, 2016, pursuant to *Consent Order Approving Settlement Agreement with Regions Bank* (the "Settlement Agreement") (Doc. 234), Myers satisfied the Regions Bank Judgment in order to protect his property rights, and thus, Myers as the "substituting party" retains

---

[1] AmSouth Bank merged with Regions Bank in 2006., and therefore the second trust mortgage originally payable to AmSouth Bank will be referred to hereinafter as the "Regions Bank Second Trust."

[2] Hereinafter, the AmSouth Credit Agreement will be referred to as the "Regions Bank Credit Agreement," and the

the rights and remedies that would otherwise belong to Regions Bank *vis a vis* the Regions Bank

Credit Agreement and the Regions Bank Mortgage.  See *Aurora v Senchuk* (1DCA) decided April

13, 2010, explaining equitable subrogation:

> It is axiomatic that the position of a lien holder has no meaning unless and until a foreclosure action is initiated. Thus, it follows the determination of what constitutes prejudice to a second lien holder must be confined to what would constitute prejudice in the event of a foreclosure.

> A second lien holder, at the point of negotiating a second mortgage, takes a risk and accepts its position in the event of a foreclosure with respect to the amount lent on the first mortgage. However, when a first mortgage loan is refinanced for more than the amount due and owing on the first mortgage, the risks assumed by the second lien holder increase without the second lien holder's consent. Namely, the refinancing lender is now able to recover more in a foreclosure action than the amount assumed recoverable by the second lien holder at the time it negotiated its second mortgage on the property.

> Equitable subrogation is defined as the placement of one party into the shoes of another so that the substituting party retains the rights, remedies, or securities that would otherwise belong to the original party. Black's Law Dictionary 1440 (7th ed. 1999). When a refinancing lender increases the principal loan amount and accepts the property used as collateral for the first mortgage, it does more than slip into the proverbial shoes of the first lender. The new mortgage holder does not retain the same rights, remedies, and securities that would be available to the first party. Instead, the new lender is entitled to no more than the original lender at the second mortgage holder's expense and without its consent.

16.    See also *Velazquez v Serrano* (3DCA) decided July 28, 2010, holding:

> **Subrogation arises by operation of law**, where one having a liability or a right or a fiduciary relation in the premises pays a debt due by another under such circumstances that he is, in equity, entitled to the security or obligation held by the creditor whom he has paid.

---

AmSouth Mortgage will be referred to as the "Regions Bank Mortgage."

(emphasis added).

17.     Bank of America's interest in the Property is <u>inferior</u> to Myers' interest in the Property, with Myers as the "substituting party" now possessing by **operation of law** - equitable subrogation the rights and remedies that would have otherwise belonged to Regions Bank.

18.     Bank of America does <u>not</u> possess a single lien against the Property equal to $1,209,642.28 (i.e., the amount set forth in the Final Judgment of Foreclosure entered April 3, 2015 in the Walton County Circuit Court). Rather, pursuant to well settled Florida law, Bank of America has two (2) *separate* liens against the Property - a **first trust lien** equal to $393,186.88,[3] and a **third trust *remainder* lien** equal to the balance of the amount set forth in the Final Judgment of Foreclosure, or $816,455.40.

19.     Myers - as the "substituting party" now possessing by **operation of law** - equitable subrogation the rights and remedies that would have otherwise belonged to Regions Bank - possesses a **second trust lien** against the Property equal to, at minimum, $580,325.22.

**COUNT I**
**EQUITABLE SUBROGATION**

20.     Plaintiff incorporates each and every preceding paragraph of this Complaint as though fully set forth herein.

21.     Myers is either a party to, or a third-party beneficiary of, the Wells Fargo Commitment Letter. The Wells Fargo Commitment Letter is a valid, binding, and enforceable contract between Plaintiff and Defendant.  The Wells Fargo Commitment Letter evidences the Defendant's promise to "Payoff all existing liens on the subject property."

---

[3] $393,186.88 is the amount paid to Wells Fargo Home Loans at closing on May 25, 2005.

22.     Myers executed the Wells Fargo Mortgage in reliance on the contractual conditions precedent set forth in the Wells Fargo Commitment Letter being satisfied, including that "any and all existing liens on the property must be paid in full at closing."

24.     The Defendant, as purchaser of the Wells Fargo Loan, now possesses all the benefits and burdens of the Wells Fargo Loan, including without limitation, the requirements contained in the Wells Fargo Commitment Letter.

23.     When the Wells Fargo Loan closed on May 25, 2005, Wells Fargo failed to pay off the AmSouth Credit Agreement secured by the AmSouth Mortgage - one of the "existing liens on the subject property."

25.     On September 12, 2011, Regions Bank sued Plaintiff in Montgomery County Circuit Court for "account stated" in connection with the Regions Bank Credit Agreement. The case was removed to the United States District Court for the Northern District of Florida, where Regions Bank ultimately obtained a judgment against Plaintiff on February 27, 2014 in the amount of $580,325.22.

26.     On or about December 7, 2016, pursuant to *Consent Order Approving Settlement Agreement with Regions Bank* (the "Settlement Agreement") (Doc. 234), Myers satisfied the Regions Bank Judgment in order to protect his property rights, and thus, Myers as the "substituting party" retains the rights and remedies that would otherwise belong to Regions Bank *vis a vis* the Regions Bank Credit Agreement and the Regions Bank Mortgage.

27.     Bank of America's interest in the Property is <u>inferior</u> to Myers' interest in the Property, with Myers as the "substituting party" now possessing by **operation of law** - equitable subrogation the rights and remedies that would have otherwise belonged to Regions Bank.

7

28.     Bank of America does <u>not</u> possess a single lien against the Property equal to

$1,209,642.28 (i.e., the amount set forth in the Final Judgment of Foreclosure entered April 3, 2015

in the Walton County Circuit Court). Rather, pursuant to well settled Florida law, Bank of America

has two (2) *separate* liens against the Property - a **first trust lien** equal to $393,186.88,[4] and a **third**

**trust** *remainder* **lien** equal to the balance of the amount set forth in the Final Judgment of

Foreclosure, or $816,455.40.

29.     Myers - as the "substituting party" now possessing by **operation of law** - equitable

subrogation the rights and remedies that would have otherwise belonged to Regions Bank - possesses

a **second trust lien** against the Property equal to, at minimum, $580,325.22.

WHEREFORE, Plaintiff prays for relief as follows:

(a)     That the Court enter a judgment in favor of Myers, and against Defendant, for

equitable subrogation in the minimum amount of $580,325.22, with said amount to be secured

against the Property in second lien position subordinate only to a first trust lien in Defendant's favor

equal to $393,186.88;

(b)     That the Court stay the foreclosure sale of the Property currently scheduled for

December 8, 2017;

(c)     That the Court enter a judgment in favor of Myers, and against Defendant, for

attorneys' fees and costs incurred by Myers in connection with his prosecution of this action; and

(e)     For such further and other relief as the Court may deem just and proper.

**COUNT II**
**NEGLIGENCE**

---

[4] $393,186.88 is the amount paid to Wells Fargo Home Loans at closing on May 25, 2005.

82.     Plaintiff incorporates each and every preceding paragraph of this Complaint as though fully set forth herein.

21.     Myers is either a party to, or a third-party beneficiary of, the Wells Fargo Commitment Letter. The Wells Fargo Commitment Letter is a valid, binding, and enforceable contract between Plaintiff and Defendant. The Wells Fargo Commitment Letter evidences the Defendant's promise to "Payoff all existing liens on the subject property" at closing on May 25, 2015. Pursuant to the terms of the Wells Fargo Commitment Letter, Defendant had a **duty** to ensure that "any and all existing liens on the property must be paid in full at closing."

22.     Myers executed the Wells Fargo Mortgage in reliance on the contractual conditions precedent set forth in the Wells Fargo Commitment Letter being satisfied, including that "any and all existing liens on the property must be paid in full at closing."

24.     The Defendant, as purchaser of the Wells Fargo Loan, now possesses all the benefits and burdens of the Wells Fargo Loan, including without limitation, the requirements contained in the Wells Fargo Commitment Letter.

23.     When the Wells Fargo Loan closed on May 25, 2005, Wells Fargo failed to pay off the AmSouth Credit Agreement secured by the AmSouth Mortgage - one of the "existing liens on the subject property." As a consequence, the Defendant breached its duty to Plaintiff.

87.     But for the Defendant's commitment that that any and all existing liens on the property would be paid in full at closing, the Plaintiff would not have executed the Mortgage, which Mortgage is not in the Plaintiff's best interest.

88.     The breach of Defendant's duty did cause Plaintiff certain harm and damage inasmuch it resulted in Plaintiff executing the Mortgage, which Mortgage is not in the Plaintiff's best

9

interest.

89.     Defendant was in a superior position to know that all existing liens on the Property were not paid off at closing on May 25, 2005. Notwithstanding Defendant's superior knowledge, Defendant induced Plaintiff to execute the Mortgage, which Mortgage is not in Plaintiff's best interest.

91.     The Defendant propagated the false representations and material omissions to the benefit of Defendant's business interests and to the detriment of Plaintiff's economic interests.

94.     The Plaintiff did justifiably and detrimentally rely on the representations made by the Defendant to induce Plaintiff to sign the Mortgage.

95.     Defendant's false representations and material omissions resulted in Plaintiff signing the Mortgage which Plaintiff would not have done had such negligence not occurred.

97.     Plaintiff's reliance on the Defendant's representations was material to Plaintiff's decision to execute the Mortgage.

98.     The Defendant's representations were false, and the falsity of these representations is material inasmuch as these representations substantially weighed on Plaintiff's decision to execute the Mortgage.

99.     The Defendant's representations were made with reckless disregard as to the truth of the matters, with the intention that Plaintiff would rely on the Defendant's representations and execute the Mortgage.

100.     As a result of the Defendant's material breach of its duty to the Plaintiff, Plaintiff has been materially harmed, and has incurred various material damages, costs and expenses associated with Plaintiff being forced to deal with the improper and unlawful actions of

Defendant and its agents, including being sued by Regions Bank on September 12, 2011 in Montgomery County Circuit Court for "account stated" in connection with the Regions Bank Credit Agreement, with Regions Bank ultimately obtaining a judgment against Plaintiff on February 27, 2014 in the amount of $580,325.22.

100.    As a result of the Defendant's material breach of its duty to the Plaintiff, Plaintiff has been materially harmed, and has incurred various material damages, costs and expenses associated with Plaintiff being forced to deal with the improper and unlawful actions of Defendant and its agents, including without limitation, being forced to deal with the Defendant's fraudulent foreclosure action in connection with 147 Silver Laurel Way, Santa Rosa Beach, FL 32459.

WHEREFORE, Plaintiff prays for relief as follows:

(a)    That the Court enter a judgment in favor of Myers, and against Defendant, for negligence, and that the Court award Myers those losses and damages incurred by Myers as a result of Defendant's negligence;

(b)    That the Court enter a judgment in favor of Myers, and against Defendant, for all foreseeable losses and damages incurred by Myers as a result of Defendant's negligence;

(c)    That the Court enter a judgment in favor of Myers, and against Defendant, for punitive damages, in an amount *not less than* Five Million Dollars ($5,000,000.00), as a result of Defendant's negligence;

(d)    That the Court enter a judgment in favor of Myers, and against Defendant, for attorneys' fees and costs incurred by Myers in connection with his prosecution of this action as a result of Defendant's negligence; and

11

(e)    For such further and other relief as the Court may deem just and proper.

## RESERVATION OF RIGHTS

Plaintiff hereby reserve the right to add additional facts and claims not currently known and that may be revealed through discovery in this matter.

RESPECTFULLY SUBMITTED on this 1st day of December, 2017.

_____
Gregory B. Myers, *pro se*
700 Gulf Shore Blvd. N.
Naples, Florida 34102
(301) 325-2312
gregbmyers@verizon.net

12

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of December, 2017, a copy of the foregoing was mailed first class, postage prepaid to:

Douglas B. Riley, Esq.
Treanor Pope & Hughes, P.A.
500 York Road
Towson, Maryland 21204
*Attorneys for Bank of America, N.A.*

Michael J. McAuliffe, Esq.
Ethridge, Quinn, Kemp, Mcauliffe, Rowan & Hartinger
33 Wood Lane
Rockville, Maryland 20850

Daniel Fogarty, Esq.
Stichter, Riedel, Blain & Postler, P.A.
110 E. Madison St., Ste. 200
Tampa, FL 33602

Roger Schlossberg, Esq.
Frank Mastro, Esq.
Schlossberg & Mastro
18421 Henson Blvd., Suite 201
Hagerstown, MD 21742
*Counsel for Chapter 7 Trustee*

Paul Sweeney, Esq.
Yumkas, Vidmar, Sweeney & Mulrenin, LLC
10211 Wincopin Circle, Suite 500
Columbia, MD 21044
*Counsel for Chapter 7 Trustee*

Office of the United States Trustee
Attn: Lynn A. Kohen, Esq.
6305 Ivy Lane, Suite 600
Greenbelt, MD 20770

_____
Gregory B. Myers, *pro se*

13

# Exhibit A

CFN # 837391, OR BK 2625 Page 4405, Recorded 08/10/2004 at 02:49 PM, MARTHA
INGLE, WALTON COUNTY CLERK OF COURT DOC STMP-M:  $1145.20 INT TAX:  $654.40
Deputy Clerk S BELL

7/28

WHEN RECORDED MAIL TO:
AmSouth Bank
Attn: Sheila Cook
P.O. Box 830734
Birmingham, AL 35283

20045610500020
07309219160G

This Mortgage prepared by:

Name: ADRIENNE REYES
Company: AMSOUTH BANK
Address: P.O. BOX 830727, BIRMINGHAM, AL 35283

## MORTGAGE

### FOR USE WITH SECURED REVOLVING CREDIT AGREEMENT

**MAXIMUM LIEN.** The total amount of indebtedness secured by this Mortgage may decrease or increase from time to time, but the maximum amount of principal indebtedness which may be outstanding at any one time shall not exceed $327,200.00, plus interest, and amounts expended or advanced by Lender for the payment of taxes, levies or insurance on the Property, and interest on such amounts.

**THIS MORTGAGE** dated July 23, 2004, is made and executed between GREGORY B. MYERS, whose address is 4506 WETHERILL RD, BETHESDA, MD  20816 and BARBARA A. KELLY, A/K/A BARBARA ANN KELLY, whose address is 4506 WETHERILL RD, BETHESDA, MD  20816; husband and wife (referred to below as "Grantor") and AmSouth Bank, whose address is 4042 Scenic Highway 30-A, Unit C, Seagrove Beach, FL 32459 (referred to below as "Lender").

**GRANT OF MORTGAGE.** For valuable consideration, Grantor mortgages to Lender all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in WALTON County, State of Florida:

LOT 9, RAINBOW ROW AT WATERCOLOR, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 14, PAGES 31 AND 31A, OF THE PUBLIC RECORDS OF WALTON COUNTY, FLORIDA.

The Real Property or its address is commonly known as  147 SILVER LAUREL WAY, SANTA ROSA BEACH, FL 32459.

**REVOLVING LINE OF CREDIT.** Specifically, in addition to the amounts specified in the Indebtedness definition, and without limitation, this Mortgage secures a revolving line of credit under which, upon request by Grantor, Lender, within twenty (20) years from the date of this Mortgage, may make future advances to Grantor. Such future advances, together with interest thereon, are secured by this Mortgage. Such advances may be made, repaid, and remade from time to time, subject to the limitation that the total outstanding balance owing at any one time, not including finance charges on such balance at a fixed or variable rate or sum as provided in the Credit Agreement, any temporary overages, other charges, and any amounts expended or advanced as provided in either the Indebtedness paragraph or this paragraph, shall not exceed the Credit Limit as provided in the Credit Agreement. It is the intention of Grantor and Lender that this Mortgage secures the balance outstanding under the Credit Agreement from time to time from zero up to the Credit Limit as provided in this Mortgage and any intermediate balance.

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

**THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF EACH OF GRANTOR'S AGREEMENTS AND OBLIGATIONS UNDER THE CREDIT AGREEMENT WITH THE CREDIT LIMIT OF $327,200.00, THE RELATED DOCUMENTS, AND THIS MORTGAGE. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:**

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Mortgage, Grantor shall pay to Lender all amounts secured by this Mortgage as they become due and shall strictly perform all of Grantor's obligations under this Mortgage.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Grantor agrees that Grantor's possession and use of the Property shall be governed by the following provisions:

Possession and Use. Until Grantor's interest in any or all of the Property is foreclosed, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

Duty to Maintain. Grantor shall maintain the Property in good condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

Compliance With Environmental Laws. Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property





CFN 837391 OR BK 2625 PG 4406

## MORTGAGE
### (Continued)

Page 2

to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Mortgage, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

**Subsequent Liens.** Grantor shall not allow any subsequent liens or mortgages on all or any portion of the Property without the prior written consent of Lender.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Mortgage:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Mortgage, except for the Existing Indebtedness referred to in this Mortgage or those liens specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and reasonable attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage:

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of ten (10) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property if the estimated cost of repair or replacement exceeds $10,000.00. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Compliance with Existing Indebtedness.** During the period in which any Existing Indebtedness described below is in effect, compliance with the insurance provisions contained in the instrument evidencing such Existing Indebtedness shall constitute compliance with the insurance provisions under this Mortgage, to the extent compliance with the terms of this Mortgage would constitute a duplication of

CFN 837391 OR BK 2625 PG 4407

## MORTGAGE
### (Continued)

Page 3

Insurance requirement. If any proceeds from the Insurance become payable on loss, the provisions in this Mortgage for division of proceeds shall apply only to that portion of the proceeds not payable to the holder of the Existing Indebtedness.

**LENDER'S EXPENDITURES.** If Grantor fails (A) to keep the Property free of all taxes, liens, security interests, encumbrances, and other claims, (B) to provide any required insurance on the Property, (C) to make repairs to the Property or to comply with any obligation to maintain Existing Indebtedness in good standing as required below, then Lender may do so. If any action or proceeding is commenced that would materially affect Lender's interests in the Property, then Lender on Grantor's behalf may, but is not required to, take any action that Lender believes to be appropriate to protect Lender's interests. All expenses incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Credit Agreement from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Credit Agreement and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Credit Agreement; or (C) be treated as a balloon payment which will be due and payable at the Credit Agreement's maturity. The Mortgage also will secure payment of these amounts. The rights provided for in this paragraph shall be in addition to any other rights or any remedies to which Lender may be entitled on account of any default. Any such action by Lender shall not be construed as curing the default so as to bar Lender from any remedy that it otherwise would have had.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

Title. Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in the Existing Indebtedness section below or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

Defense of Title. Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

Compliance With Laws. Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

Survival of Promises. All promises, agreements, and statements Grantor has made in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature and shall remain in full force and effect until such time as Grantor's Indebtedness is paid in full.

**EXISTING INDEBTEDNESS.** The following provisions concerning Existing Indebtedness are a part of this Mortgage:

Existing Lien. The lien of this Mortgage securing the Indebtedness may be secondary and inferior to an existing lien. Grantor expressly covenants and agrees to pay, or see to the payment of, the Existing Indebtedness and to prevent any default on such Indebtedness, any default under the instruments evidencing such Indebtedness, or any default under any security documents for such Indebtedness.

No Modification. Grantor shall not enter into any agreement with the holder of any mortgage, deed of trust, or other security agreement which has priority over this Mortgage by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender. Grantor shall neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Mortgage:

Proceedings. If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

Application of Net Proceeds. If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

Current Taxes, Fees and Charges. Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all intangible personal property taxes, documentary stamp taxes, fees, and other charges for recording or registering this Mortgage.

Taxes. The following shall constitute taxes to which this section applies: (1) a specific tax, including without limitation an intangible personal property tax, upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Grantor which Grantor is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (3) a tax on this type of Mortgage chargeable against the Lender or the holder of the Credit Agreement; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Grantor.

Subsequent Taxes. If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage:

Security Agreement. This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

Security Interest. Upon request by Lender, Grantor shall execute financing statements and take whatever other action is requested by Lender to perfect and continue Lender's security interest in the Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

Addresses. The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Mortgage may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Mortgage.



CFN 837391 OR BK 2625 PG 4408

## MORTGAGE
### (Continued)

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Mortgage:

*Further Assurances.* At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Grantor's obligations under the Credit Agreement, this Mortgage, and the Related Documents, and (2) the liens and security interests created by this Mortgage on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

*Attorney-in-Fact.* If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Grantor pays all the Indebtedness when due, terminates the credit line account, and otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**EVENTS OF DEFAULT.** Grantor will be in default under this Mortgage if any of the following happen: (A) Grantor commits fraud or makes a material misrepresentation at any time in connection with the Credit Agreement. This can include, for example, a false statement about Grantor's income, assets, liabilities, or any other aspects of Grantor's financial condition. (B) Grantor does not meet the repayment terms of the Credit Agreement. (C) Grantor's action or inaction adversely affects the collateral or Lender's rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without Lender's permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

*Accelerate Indebtedness.* Lender shall have the right at its option without notice to Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment penalty which Grantor would be required to pay.

*UCC Remedies.* With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

*Appoint Receiver.* Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

*Judicial Foreclosure.* Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

*Deficiency Judgment.* If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

*Tenancy at Sufferance.* If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

*Other Remedies.* Lender shall have all other rights and remedies provided in this Mortgage or the Credit Agreement or available at law or in equity.

*Sale of the Property.* To the extent permitted by applicable law, Grantor hereby waives any and all right to have the Property marshalled. In exercising its rights and remedies, Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

*Notice of Sale.* Lender will give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

*Election of Remedies.* All of Lender's rights and remedies will be cumulative and may be exercised alone or together. An election by Lender to choose any one remedy will not bar Lender from using any other remedy. If Lender decides to spend money or to perform any of Grantor's obligations under this Mortgage, after Grantor's failure to do so, that decision by Lender will not affect Lender's right to declare Grantor in default and to exercise Lender's remedies.

*Attorneys' Fees; Expenses.* If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Credit Agreement rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**NOTICES.** Any notice required to be given under this Mortgage, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage. Any person may change his or her address for notices under this Mortgage by giving written notice to the other person or persons, specifying that the purpose of the notice is to change the person's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors. It will be Grantor's responsibility to tell the others of the notice from Lender.

**DEFENSE COSTS.** In addition to the costs and expenses I have agreed to pay under "Collection Costs" above, I will pay all costs and expenses incurred by Lender arising out of or relating to any steps or actions Lender takes to defend any unsuccessful claim, allegation or counterclaim I may make against Lender. Such costs and expenses include, without limitation, attorneys' fees and costs.

CFN 837391 OR BK 2625 PG 4409

**MORTGAGE**
**(Continued)**

Page 5

**TERMS OF CREDIT AGREEMENT.** Unless sooner terminated according to the provisions thereof, the Credit Agreement shall terminate and expire 20 years from the date of this Mortgage.

**STOPPING PAYMENT ON ESSENTIALINE CHECKS.** If you want to stop payment on an EssentiaLine check, you may do so by calling us at 1-800-231-7493. You must tell us the number of your Credit Line Account, the party to whom you wrote the EssentiaLine Check, and the date, number and amount of the EssentiaLine Check. If you do not contact us at least two (2) hours before we receive an EssentiaLine Check, we may not be able to stop payment on it. If you choose to stop payment on any EssentiaLine Check, you agree to pay our standard fee then in effect for stopping payment on a check.

**PROPERTY IS GRANTOR'S RESIDENCE.** Grantor covenants and agrees that the Property shall be occupied by Grantor as Grantor's primary residence or as Grantor's secondary residence as those terms are hereinafter defined. A "primary residence" is defined as a residence that serves as Grantor's principal residence and is occupied by Grantor for more than six months during any calendar year. A "secondary residence" is defined as a residence that Grantor occupies in addition to his or her primary residence and that is not leased, let, rented or leased for more than four months during any calendar year. Neither the assignment of Rents contained in this Mortgage nor the permission reserved to Grantor under this Mortgage to use, operate or manage the Property or to collect Rents from the Property prior to foreclosure shall be construed as permission to license, let, rent or lease any portion of the Property such that it will no longer qualify as a primary or secondary residence as defined above.

**ARBITRATION OF DISPUTES AND WAIVER OF JURY TRIAL.** Except as expressly provided below, any controversy, claim, dispute or disagreement (any "Claim") arising out of, in connection with or relating to (1) Grantor's business relationship with Lender; (2) the performance, interpretation, negotiation, execution, administration, administration, repayment, modification, or extension of this Mortgage; (3) any charge or cost incurred pursuant to this Mortgage; (4) the collection of any amounts due under this Mortgage; (5) any alleged tort or other claim arising out of or relating in any way to this Mortgage, collateral under this Mortgage, any amount established pursuant to this Mortgage, or any insurance or mechanical repair contract purchased pursuant to or in connection with this Mortgage; (6) any breach of any provision of this Mortgage; (7) any statement or representation made to Grantor by or on behalf of Lender; or (8) any of the foregoing arising out of, in connection with or relating to any agreement which relates to this Mortgage or any transaction of this Mortgage, or any relationship created by or resulting from this Mortgage, will be settled by binding arbitration under the Federal Arbitration Act ("FAA"). This agreement to arbitrate shall include any Claims involving Lender's officers, directors, employees, agents, representatives, contractors, subcontractors, affiliates, successors or assigns, and any such Claims against any of these parties may be joined or consolidated with any related Claims against Lender in a single arbitration proceeding.

**Administration and Rules.** The arbitration will be administered by the American Arbitration Association (the "AAA") under its Commercial Arbitration Rules and, where applicable, its Supplementary Procedures for the Resolution of Consumer-Related Disputes (collectively, the "Arbitration Rules") in effect at the time the demand for arbitration is filed. In the event of a conflict between the Arbitration Rules and this Mortgage, this Mortgage will control, except that, in the event that the AAA determines that any provision of this Mortgage does not comply with applicable standards stated in the AAA's Consumer Due Process Protocol, the standards of the Protocol will control. Lender will tell Grantor how to contact the AAA and how to get a copy of the Arbitration Rules without cost if Grantor asks Lender in writing to do so. Or, Grantor may contact the AAA directly at 1-800-778-7879 (toll-free) or at www.adr.org.

**Arbitration Fees and Costs.** If the AAA's Supplemental Procedures for Consumer-Related Disputes apply to Grantor's Claim or Counterclaim, and if Grantor's Claim or Counterclaim for actual damages does not exceed $10,000, Grantor will be responsible for paying one-half of the arbitrator's fees up to a maximum of $125. If Grantor's Claim or Counterclaim for actual damages exceeds $10,000 but does not exceed $75,000, Grantor will be responsible for paying one-half of the arbitrator's fees up to a maximum of $375. For such Claims or Counterclaims that do not exceed $75,000, Lender will pay all other arbitrator's fees and costs imposed by the administrator of the arbitration.

If Grantor's claim or counterclaim is a consumer-related claim for actual damages that exceeds $75,000, or if it is a non-monetary consumer-related claim or counterclaim, or if it is not a consumer-related claim or counterclaim, Grantor will be responsible for paying the administrative costs and arbitrator's fees as provided in the AAA's Commercial Fee Schedule. Additionally, in the case of a consumer-related claim or counterclaim for actual damages in excess of $75,000 or for non-monetary damages, and in the case of any non-consumer-related claim or counterclaim, the prevailing party in an arbitration proceeding may seek to recover its expenses for administrative fees and arbitrator(s) fees from the other party in accordance with the Arbitration Rules. The final award by the arbitrator(s) pertaining to such a Claim or Counterclaim can apportion the administrative fees and expenses and arbitrator's fees between Grantor and Lender as part of the award, as the arbitrator(s) determines is appropriate.

The fees and costs stated in this Mortgage are subject to any amendments to the Arbitration Rules and fee and cost schedules of the AAA. The fee and cost schedule in effect at the time Grantor submits its claim or counterclaim will apply. The Arbitration Rules permit Grantor to request a deferral or reduction of the administrative fees of arbitration if paying them would cause Grantor extreme hardship. Each party also has the option of filing an action in small claims court for Claims or disputes within the scope of the small claims court's jurisdiction.

**Arbitration.** The arbitration of any Claim or any counter-Claim of $100,000 or greater shall be conducted by a panel of three arbitrators. The arbitration of any Claim or any Counter-Claim of a lesser amount shall be conducted by one arbitrator. The arbitrator(s) shall be selected from the AAA's panel of arbitrators by mutual agreement between Grantor and Lender. If Grantor and Lender cannot agree on the arbitrator(s), the AAA shall appoint the arbitrator(s).

**No Joinder of Claims; No Class Claims.** Except as expressly provided in this agreement to arbitrate, no Claim may be joined with another dispute or lawsuit, or consolidated with the arbitration of another Claim, or resolved on behalf of a class of similarly situated persons. The validity and effect of this provision of this agreement to arbitrate shall be determined by a court of competent jurisdiction and not by the arbitrator(s).

**Limitations, Defenses and Privileges.** All statutes of limitation, defenses, and attorney-client and other privileges that would apply in a court proceeding will apply in the arbitration.

**Location of Hearing.** Any in-person arbitration hearing will be held in Birmingham, Alabama, where Lender's main office is located, or in the state where this Mortgage was executed if Lender has a branch office in that state.

**Scope.** Except as otherwise expressly provided in this agreement to arbitrate, any dispute regarding whether a particular controversy is subject to arbitration, including any claim of unconscionability and any dispute over the scope or validity of this agreement to arbitrate disputes or of this entire Mortgage, will be decided by the arbitrator(s).

**Exchange of Information.** The arbitrator(s) shall establish such reasonable procedures as may be necessary for the reasonable exchange of information between the parties prior to such arbitration.

**Expedited Procedures.** The Expedited Procedures of the Arbitration Rules shall apply in any dispute where no claim or counterclaim exceeds $75,000, exclusive of interest and arbitration fees and costs.

**Award.** In rendering an award, the arbitrator(s) shall apply applicable contract terms, statutes and legal precedent and shall follow applicable rules of evidence, enforce applicable privileges, and employ applicable burdens of proof. The arbitrator(s) shall award only such relief as a court of competent jurisdiction could properly award under applicable law. The arbitrator(s) award shall be in writing and shall include a written explanation of the basis for the award under the applicable contract terms, statutes and legal precedents. Any appeal of the arbitration award will be governed by the FAA. Judgment on the arbitration award may be entered in any court having jurisdiction.

**Self-Help Remedies and Small Claims Court.** This agreement to arbitrate does not limit the right of Grantor or Lender, whether before, during or after the pendency of any arbitration proceeding, to exercise self-help remedies such as set-off or repossession and sale of collateral, or to foreclose a mortgage with or without a court action, or to bring an action (individually, and not on behalf of a class) to obtain provisional or ancillary remedies or injunctive relief (other than a stay of arbitration) to protect the rights or property of the party

CFN 837391 OR BK  2625  PG  4410

# MORTGAGE
## (Continued)

Page 6

seeking such relief. The taking of any of the actions described in the preceding sentence by Grantor or Lender or the filing of a court action by Grantor or Lender shall not be deemed to be a waiver of the right to demand arbitration of any Claim asserted as a counterclaim or the like in response to any such action. This agreement to arbitrate does not limit Grantor's or Lender's right to file an action in small claims court for Claims or disputes within the scope of the small claims court's jurisdiction.

**Transactions Involving Commerce.** Grantor and Lender specifically acknowledge and agree that this Mortgage evidences a "transaction involving commerce" under the FAA, and hereby waive and relinquish any right to claim otherwise. Grantor and Lender hereby stipulate and agree that a multi-state banking organization engaged in interstate banking: Lender's deposits are federally insured, the funds used to fund loans such as this one are obtained, at least in part, through interstate commerce; and Lender regularly uses the services of businesses located in other states in making and administering loans and in conducting other transactions.

**Severability.** Except as provided in the following sentence, if any term or provision of this agreement to arbitrate disputes and waiver of jury trial is held to be invalid or unenforceable, the remaining provisions shall be enforced without regard to the invalid or unenforceable term or provision. If the prohibition against joinder of claims and class actions, or any portion thereof, is held to be invalid or unenforceable, then the agreement to arbitrate disputes shall also be invalid and unenforceable, but the waiver of jury trial shall continue to be enforceable.

**Survival of Arbitration Agreement.** This agreement to arbitrate disputes will survive the payment of the Indebtedness and the termination of this Mortgage.

**Right to Reject Arbitration Agreement.** Grantor may reject this agreement to arbitrate by sending a letter to Lender at the following address:

AmSouth Bank
Attention: Manager, Consumer Loan Center
P.O. Box 830721
Birmingham, AL 35283

To be effective, Grantor's letter must be received by Lender at the above address within thirty days of the date of this Mortgage. If Grantor rejects this agreement to arbitrate, Grantor will still be bound by all the other terms and conditions of this Mortgage, including the waiver of any right to a jury trial.

**Waiver of Right to Jury Trial.** WHETHER ANY CLAIM OR DISPUTE IS SUBMITTED TO ARBITRATION OR RESOLVED BY A COURT, GRANTOR AND LENDER VOLUNTARILY AND KNOWINGLY WAIVE ANY RIGHT TO A JURY TRIAL WITH RESPECT TO SUCH DISPUTE TO THE FULLEST EXTENT ALLOWED BY LAW.

**NOTICE:** This agreement to arbitrate disputes limits or waives certain of Grantor's rights. With respect to Claims Grantor is agreeing to arbitrate pursuant to this Mortgage, Grantor is waiving Grantor's right to bring a court action, and Grantor is waiving the right to have a jury trial on all controversies, whether settled by arbitration or by a court. Grantor cannot represent a class of claimants in the arbitration proceeding. Discovery may be more limited in arbitration than in a court proceeding, and the right and grounds to appeal from an arbitrator's award are more limited than in an appeal from a court judgment. Certain other rights Grantor has in a court proceeding also may not be available in arbitration.

MISCELLANEOUS PROVISIONS. The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** What is written in this Mortgage and in the Related Documents is Grantor's entire agreement with Lender concerning the matters covered by this Mortgage. To be effective, any change or amendment to this Mortgage must be in writing and must be signed by whoever will be bound or obligated by the change or amendment.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Governing Law.** This Mortgage will be governed by and interpreted in accordance with federal law and the laws of the State of Florida. This Mortgage has been accepted by Lender in the State of Florida.

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of the State of Maryland, in the county in which Grantor's following address is located: 4605 WETHERILL RD, BETHESDA, MD  20816.

**Joint and Several Liability.** All obligations of Grantor under this Mortgage shall be joint and several, and all references to Grantor shall mean each and every Grantor. This means that each Grantor signing below is responsible for all obligations in this Mortgage.

**No Waiver by Lender.** Grantor understands Lender will not give up any of Lender's rights under this Mortgage unless Lender does so in writing. The fact that Lender delays or omits to exercise any right will not mean that Lender has given up that right. If Lender does agree in writing to give up one of Lender's rights, that does not mean Grantor will not have to comply with the other provisions of this Mortgage. Grantor also understands that if Lender does consent to a request, that does not mean that Grantor will not have to get Lender's consent again if the situation happens again. Grantor further understands that just because Lender consents to one or more of Grantor's requests, that does not mean Lender will be required to consent to any of Grantor's future requests. Grantor waives presentment, demand for payment, protest, and notice of dishonor.

**Severability.** If a court finds that any provision of this Mortgage is not valid or should not be enforced, that fact by itself will not mean that the rest of this Mortgage will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Mortgage even if a provision of this Mortgage may be found to be invalid or unenforceable.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Mortgage on transfer of Grantor's interest, this Mortgage shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Mortgage and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Mortgage or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Mortgage.

**Waive Jury.** All parties to this Mortgage hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

DEFINITIONS. The following words shall have the following meanings when used in this Mortgage:

**Borrower.** The word "Borrower" means GREGORY B. MYERS and BARBARA A. KELLY and includes all co-signers and co-makers signing the Credit Agreement.

**Credit Agreement.** The words "Credit Agreement" mean the credit agreement dated July 23, 2004, with credit limit of $327,250.00 from Grantor to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. The final maturity date of the Credit Agreement is July 23, 2024. NOTICE TO GRANTOR: THE CREDIT AGREEMENT CONTAINS A VARIABLE INTEREST RATE.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

CFN 837391 OR BK 2625 PG 4411

## MORTGAGE
(Continued)

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the events of default section of this Mortgage.

**Existing Indebtedness.** The words "Existing Indebtedness" mean the indebtedness described in the Existing Liens provision of this Mortgage.

**Grantor.** The word "Grantor" means GREGORY S. MYERS and BARBARA A. KELLY.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" makes all principal and interest payable under the Credit Agreement and any amounts expended or advanced by Lender to discharge obligations of Grantor or expenses incurred by Lender to enforce obligations of Grantor under this Agreement, together with interest on such amounts as provided in this Agreement, and any and all other present or future, direct or contingent liabilities or indebtedness of any person who signs the Credit Agreement to the Lender of any nature whatsoever, whether classified as secured or unsecured, except that the word "Indebtedness" shall not include any debt subject to the disclosure requirements of the Federal Truth-in-Lending Act if, on the time such debt is incurred, any legally required disclosure of the lien afforded hereby with respect to such debt shall not have been made.

**Lender.** The word "Lender" means AmSouth Bank, its successors and assigns. The words "successors or assigns" mean any person or company that acquires any interest in the Credit Agreement.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

**WAIVER OF FUTURE ADVANCES UNDER PRIOR MORTGAGE.** Grantor hereby agrees that the principal Indebtedness secured by any mortgages or security agreements which are senior to the lien of this Mortgage shall not exceed the amount which upon the date of the execution of this Mortgage has actually been advanced and is secured by each such prior mortgage and security agreement. As principal Indebtedness of each prior mortgage or security agreement is reduced, the maximum amount that may be secured thereby shall also be reduced to the then outstanding principal balance(s). Grantor hereby waives the right to receive any additional or future advances under any such prior mortgages or security agreements. This paragraph shall constitute the notice required by Florida Statutes Section 697.04(b).

EACH GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND EACH GRANTOR AGREES TO ITS TERMS.

GRANTOR:

X _____
GREGORY S. MYERS

X _____
BARBARA A. KELLY

WITNESS:

X _____
as to both

X _____
ROBERT M. GRATZ

CFN 837391 OR BK 2625 PG 4412

**MORTGAGE**
(Continued)

Page 8

### INDIVIDUAL ACKNOWLEDGMENT

STATE OF _MARYLAND_

COUNTY OF _MONTGOMERY_

The foregoing instrument was acknowledged before me this _25th_ day of _July_, 20_04_ by GREGORY S. MYERS and BARBARA A. KELLY, husband and wife, who are personally known to me or who have produced _DRIVERS LICENSE_ as identification and did / did not take an oath.

_Robert M. Gratz_
(Signature of Person Taking Acknowledgment)

_Robert M. Gratz_
(Name of Acknowledger Typed, Printed or Stamped)

_Notary Public_
(Title or Rank)

_n/a_
(Serial Number, if any)

MY COMMISSION EXPIRES 12/1/04

ROBERT M. GRATZ
Notary Public - Maryland
Montgomery County

# Exhibit B

DUPLICATE
## COMMITMENT LETTER

| | |
|---|---|
| Date | MAY 23, 2005 |
| Lender | WELLS FARGO BANK, N.A. |
| Borrower(s) | BARBARA ANN KELLY |

Present Address   4505 WETHERILL RD
BETSDA, MD  20816

The Lender is pleased to inform you that your loan application has been approved, subject to the following terms and conditions.

COMMITMENT TERMS - Based on Lock-In Terms
Commitment Expiration Date: 07/16/05
Property Address: 147 SILVER LAUREL WAY
                  SANTA ROSA BEACH, FL  32459
Property Type: SFD: SINGLE FAMILY DWELLING        Sales Price:                N/A
Loan Number: 0144635299                           Loan Type:         CONVENTIONAL
Loan Product: 10/1 YEAR ADJUSTABLE RATE           Loan Amount:          $875,300
              FIRST MORTGAGE LOAN                  Base Loan Amount:           $0
Loan Term:    360 MONTHS                          Interest Rate:             N/A
Amortization Type: Interest Only Payment          Interest Only (Months): 120
Mortgage Insurance Monthly Premium:        N/A     SRP%:      N/A
Mortgage Insurance Initial Premium:        N/A  Broker Discount:      0.000%
UNDERWRITING REVIEW FEE:  $450.00
Initial Interest Rate:           5.625%           Loan Origination Fee:      N/A
                        (guaranteed)
Index:     3.350%   1 YEAR TREASURY               Loan Discount:          0.000%
Margin:    2.750%
Interest Rate Caps:  5.000%              2.000%                  5.000%
     Max. First Adjustment   Max. Periodic Adj. Thereafter   Max. Lifetime Adj.

Interest Only Payment (not including monthly accruals for taxes, hazard insurance or other escrows required by the Lender): $4,102.97 (This reflects the Initial Interest Only Payment).

Your loan must close at least three (3) business days prior to the lock-in expiration date.  If your loan does not close at least three business days prior to the lock-in expiration date or, in the event your Lock-In Agreement/Confirmation expires prior to either loan closing or the expiration of this Commitment, the Interest Rate, Origination Fee, and Discount Points on your loan will be subject to change and may be higher. You must re-qualify for the loan at the higher rates.
Lock-In Expiration Date: 06/06/05

## GENERAL CONDITIONS

o The Lender is under no obligation to extend the expiration date of this Commitment. The Lender reserves the right to charge a fee for any such extension and may require loan documents to be updated, at your cost, prior to closing.

o The Lender reserves the right to withdraw this Commitment or to modify its terms if (1) any material facts appear that you have not previously revealed to the Lender, (2) there is any adverse change in your credit, outstanding liabilities or employment, (3) any material representations made in your loan application are incorrect, or (4) any temporary interest rate buydown funds are not paid as described in this Commitment Letter.

o You may not assign this Commitment under any conditions. The Lender may, however, transfer this Commitment.

o As discussed at the time of your loan application, a copy of this Commitment Letter is being forwarded to the Broker who registered your loan application. The information provided to the Broker is exclusively for his or her use in connection with this loan transaction.

**TITLE MATTERS**
A title insurance binder from a company acceptable to the Lender must be provided to the Lender prior to closing. The mortgage title insurance policy must include survey coverage and insure the validity and priority of the Lender's first lien on the property, subject only to conditions acceptable to the Lender. Upon request, you may be required to provide a survey to meet the survey coverage requirement.

**LEGAL COMPLIANCE**
The property must comply with applicable zoning, building, and other laws and regulations. If requested by the Lender or title insurance company, a copy of the Certificate of Occupancy for the property must be provided prior to closing.

**LEGAL DOCUMENTS**
This loan is subject to the terms of the standard Note, Security Instrument, and such other documents deemed necessary by the Lender.

**PERFORMANCE**
You agree to execute all documents required by the Lender to comply with applicable regulations and render the loan saleable in the secondary market. This provision will survive the closing of the loan contemplated herein.

**PAYMENT OF CLOSING COSTS**
You are responsible for payment of all closing costs incurred in this loan transaction. In no event will the Lender be responsible for any closing costs.

**APPLICATION FEE DEPOSITS**
Any Application Fee deposits received by the Lender will be applied toward the actual fees incurred in the processing of your loan application (e.g., appraisal, credit report).

## GENERAL CONDITIONS (Cont'd)

**ESCROWS**

Your monthly mortgage payment will include, in addition to principal and interest, amounts allocated for payment of taxes and/or hazard insurance and/or mortgage insurance premiums. At the time of settlement, amounts will be collected to cover all initial costs of these escrows as well as provide necessary reserves for future bills. The monthly amounts for these escrows will be determined at that time.

**EXISTING LIENS**

Unless otherwise provided in the specific conditions section of this commitment, any and all existing liens on the property must be paid in full at closing.

**FLOOD INSURANCE**

If at any time the property is indicated as being in a Special Flood Hazard Area, as determined by the Federal Emergency Management Agency, flood insurance is required under the National Flood Insurance Act of 1968 as amended.

CONDITIONS OF LOAN APPROVAL

The following conditions must be satisfied prior to the issuance of Closing Instructions to your settlement agent or attorney:

o  Initial Flood Zone Determination Certificate from an approved vendor as mandated by the National Flood Insurance Reform Act of 1968 as amended.
                                                                    SATISFIED

o  Subject to receipt and satisfactory review of an acceptable ALTA Title Commitment.
                                                                    SATISFIED

o  PROVIDE TAX BILLS VEIFYING OWNERSHIP AND VERIFYING TAX          SATISFIED
   AMOUNTS ON THE LOTS. LOA N APPROVAL IS SUBJECT TO NO CHANGE
   IN AM OUNTS DISCLOSED ON THE APPLICATION.

o  PROVIDE A VERBAL VERFICATION FROM BORROW ERS EMPLOYER          SATISFIED
   VERIFYING SHE DOESN'T OWN 25% OR MORE OF THE COMPANY DUE TO
   TITLE BEING PRESIDENT. ALSO, VERBAL SHOWS THE ADDRESS OF THE
   COMPANY AS BORROWERS RES IDENCE. PLEASE EXPLAIN.

o  PROVIDE A 1003 FOR BORROWER STATING SHE IS SELF EMPLOYED.      SATISFIED
   ORIGINAL 1003 AND TYP ED IN FILE DON'T SHOW HER AS SELF
   EMPLOY ED

## CONDITIONS OF LOAN APPROVAL (Cont'd)

The following conditions must be reviewed and satisfied by the
lender's Underwriting prior to the signing of Closing Documents for
your loan.

o  MAXIMUM TOTAL HOUSING EXPENSE NOT TO EXCEED $6268. WFHM
   CLOSING DEPARTMENT TO CLEAR.

o  **PRIOR TO FUNDING** BORROWER TO SIGN IRS FORM 4506T

## CONDITIONS OF LOAN APPROVAL (Cont'd)

The following conditions must be satisfied <u>at the time of loan closing</u>:

o   Lender will not originate or purchase any loan that qualifies as a "high cost loan" under any federal, state and/or local high cost lending law. High cost loan screening must be satisfactorily completed as part of the closing process, as applicable, according to federal, state and/or local law.

o   Borrower to provide a copy of the existing hazard insurance policy.

o   Pay off all existing liens on the subject property.

o   Signed and completed form #4506T for each borrower.

o   MAXIMUM LOCK-IN RATE IS 5.625%.

o   ALL BORROWERS TO SIGN & DATE IRS FORM 4506T.

o   FINAL CASH TO CLOSE FROM BORROWER NOT TO EXCEED 0 THE LOAN MAY NOT FUND AND WILL BE SUBJECT TO ADDITIONAL UNDERWRITING IF THE CASH-TO-CLOSE FIGURE IS EXCEEDED

o   HUD-1 SETTLEMENT STMT TO REFLECT PAYOFF OF THE FOLLOWING ACCOUNTS WELLS FARGO 392815

o   YOUR WFHM CONTACT ON THIS FILE IS MOLLI GALLIGAN. YOU MAY REACH THEM DIRECTLY AT 866-867-4166 EXTENSION 8439. PLEASE FAX CONDITIONS DIRECTLY TO YOUR CONTACT AT 866-705-4795.

*PAGE 7/7 Commitment Letter*

**ATTACHMENTS**

The attachment(s) included in this Commitment Package is (are) listed below. Some of the conditions set forth in this Commitment are more fully explained in the attachment(s).

º Hazard Insurance Requirements

**Signed:** WELLS FARGO BANK, N.A.

*Barbara Kelly 5-25-05*
*BARBARA ANN KELLY*

# Exhibit C

CFN # 891666, OR BK 2671  Page 3627, Recorded 05/27/2005 at 02:41 PM, MARTHA INGLE, WALTON COUNTY CLERK OF COURT DOC STMP-M:  $3063.55 INT TAX:  $1750.60 Deputy Clerk R DAVIS

McNeese Title, LLC
P. O. Box 611130
Rosemary Beach, FL 32461
Return To:
LOS-0203 WELLS FARGO BANK, N.A.
FINAL DOCUMENTS X4701-022
1000 BLUE GENTIAN ROAD
EAGAN, MN  55121-1883

This document was prepared by:
MATT CUMMINGS
WELLS FARGO BANK, N.A.
1 HOME CAMPUS X2508-024
DES MOINES, IA  50328-

————————[Space Above This Line For Recording Data]————————

# MORTGAGE

0144535299

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated MAY 25, 2005 together with all Riders to this document.
(B) "Borrower" is
BARBARA ANN KELLY AND GREGORY B MYERS, WIFE AND HUSBAND

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is  WELLS FARGO BANK, N.A.

Lender is a National Association
organized and existing under the laws of THE UNITED STATES OF AMERICA

FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    FORM 3010    1/01

Page 1 of 18          Initials:                                        SFL01    Rev 11/02/00

CFN 891666 OR BK  2571  PG  3628

Lender's address is

P. O. BOX 5137, DES MOINES, IA  50306-5137
Lender is the mortgagee under this Security Instrument.
**(D) "Note "** means the promissory note signed by Borrower and dated MAY 25, 2005
The Note states that Borrower owes Lender EIGHT HUNDRED SEVENTY-FIVE
THOUSAND THREE HUNDRED AND NO/100                                        Dollars
(U.S. $ .....875,300.00.............) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than  JUNE 1, 2035
**(E) "Property"** means the property that is described below under the heading "Transfer of
Rights in the Property."
**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges
and late charges due under the Note, and all sums due under this Security Instrument, plus
interest.
**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower.
The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [X] Second Home Rider |
| [ ] Balloon Rider | [X] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as
well as all applicable final, non-appealable judicial opinions.
**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a
condominium association, homeowners association or similar organization.
**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an
electronic terminal, telephonic instrument, computer, or magnetic tape so as to order,
instruct, or authorize a financial institution to debit or credit an account. Such term includes,
but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers
initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(K) "Escrow Items"** means those items that are described in Section 3.
**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation
or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or
(iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of,
or default on, the Loan.
**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and
interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

SFL02   Rev 12/18/00              Page 2 of 18          Initials:              FORM 3019   1/01

CFN 891666 OR BK  2671  PG  3629

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's convenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, the following described property located in the     County          of          WALTON

      [Type of Recording Jurisdiction]      [Name of Recording Jurisdiction]:

LEGAL DESCRIPTION IS ATTACHED HERETO AS SCHEDULE "A" AND MADE A PART HEREOF.

Parcel ID Number:    153S19254030000060                    which currently has the address of
147 SILVER LAUREL WAY                                                                [Street]

("Property Address"):          SANTA ROSA BEACH          [City], Florida    32459    [Zip Code]

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

SFL03    Rev 11/02/00              Page 3 of 18          Initials:          FORM 3010    1/01

CFN 851666 OR BK 2671 PG 3630

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

SFL04    Rev 11/02/00                     Page 4 of 18        Initials:                   FORM 3010    1/01

CFN 891666 OR BK  2671  PG  3631

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

SFL05   Rev 11/14/00                    Page 5 of 18              Initials: _____              FORM 3010   1/01

CFN 8º1666 OR BK  2671  PG  3632

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

SFL06   Rev 05/11/00         Page 6 of 18       Initials: _____       FORM 3010   1/01

CFN 89±666 OR BK 2671 PG 3633

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower. Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection

CFN 89-1666 OR BK  2671  PG  3634

shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

CFN 8\1666 OR BK   2671   PG   3635

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage

SFL09   Rev  09/11/00                Page 8 of 18        Initials:             FORM 3010   1/01

CFN 861666 OR BK 2671 PG 3636

ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact the the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designed payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designed payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

CFN 891666 OR BK  2671  PG  3637

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

CFN 892666 OR BK 2671 PG 3638

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provision of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

SFL12   Rev 11/02/00                    Page 12 of 18          Initials          FORM 3016   1/01

CFN 891666 OR BK 2671 PG 3639

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

SRL13  Rev 11/02/00                    Page 13 of 18           Initials:               FORM 3010   1/01

CFN 891666 OR BK  2671  PG  3640

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note,

SFL14   Rev 12/27/00         Page 14 of 18        Initials _____        FORM 3010   1/01

CFN 891666 OR BK  2671  PG  3641

this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer or servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environment Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

CFN 891666 OR BK 2671 PG 3642

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

CFN 891666 OR BK 2671 PG 3643

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____      _____ (Seal)
Jason Sharman (as to both)          BARBARA ANN KELLY                Borrower
                                    147 SILVER LAUREL WAY
                                    SANTA ROSA BEACH, FL 32459

_____      _____ (Seal)
MICHELLE Turner-Johnson            GREGORY B MYERS                  Borrower
  (as to Both)                      Mailing Address: 4505 Wetherill Rd.
                                    Bethesda, MD. 20816

SFL17   Rev 12/27/00        Page 17 of 18        Initials: _____        FORM 3010   1/01

CFN 891666 OR BK  2671  PG  3644

STATE OF ~~FLORIDA~~  MARYLAND , Montgomery                    County ss:

This foregoing instrument was acknowledged before me this May 25, 2005  by
BARBARA ANN KELLY AND GREGORY B MYERS, WIFE AND HUSBAND

Non-Borrower: GREGORY B MYERS

who is personally known to me or who has produced  a Maryland Driver's License as Identification.

ROBERT R. GRATZ
Notary Public - Maryland
Montgomery County

Notary Public

My Commission Expires  12|1|08

SFL18    Rev 10/18/00              Page 18 of 18        Initials _____        FORM 3010    1/01

CFN 891666 OR BK 2671 PG 3645

# Exhibit "A"

Lot 6 of RAINBOW ROW AT WATERCOLOR, according to the Plat thereof as recorded in Plat Book 14, Page(s) 31 and 31A, of the Public Records of Walton County, Florida.

CFN 891666 OR BK 2671 PG 3646

# SECOND HOME RIDER

0144635288

THIS SECOND HOME RIDER is made this ...25th day of MAY, 2005................., and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower,") whether there are one or more persons undersigned to secure Borrower's Note to .
WELLS FARGO BANK, N.A. ......................................................................................

(the "Lender") of the same date and covering the Property described in the Security Instrument (the "Property"), which is located at: ...................................................................................
147 SILVER LAUREL WAY ....................................................
SANTA ROSA BEACH, FL 32459 ...........................................
*(Property Address)*

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree that Sections 6 and 8 of the Security Instrument are deleted and are replaced by the following:

6. Occupancy. Borrower shall occupy, and shall only use, the Property as Borrower's second home. Borrower shall keep the Property available for Borrower's exclusive use and enjoyment at all times, and shall not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires Borrower either to rent the Property or give a management firm or any other person any control over the occupancy or use of the Property.

MULTISTATE SECOND HOME RIDER - Single Family -
Fannie Mae/Freddie Mac Uniform Instrument

Form 3890 1/01 (Page 1 of 2)
EC084L Rev. 11/13/00

CFN 89⅃666 OR BK  2671  PG  3647

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's second home.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Second Home Rider.

_____(Seal)
BARBARA ANN KELLY                -Borrower

_____(Seal)
GREGORY B MYERS                  -Borrower

MULTISTATE SECOND HOME RIDER - Single Family -
Fannie Mae/Freddie Mac Uniform Instrument

Form 3890 1/01   (Page 2 of 2)
EC084L Rev. 11/13/00

CFN 891666 OR BK  2671  PG  3648

# PLANNED UNIT DEVELOPMENT RIDER

0144635299

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 25th day of MAY, 2005, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to ....................................................................................
............................ WELLS FARGO BANK, N.A. ............................................................

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at: ........................ 147 SILVER LAUREL WAY ........................................................
.............................. SANTA ROSA BEACH, FL  32459 ........................................................
*(Property Address)*

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in ........................................................................................................................................................
........................................................................................................................................................

(the "Declaration"). The Property is a part of a planned unit development known as ............................................. WATERCOLOR .............................................................................
*(Name of Planned Unit Development)*

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

MULTISTATE PUD RIDER
Single Family - FNMA/FHLMC Uniform Instrument

Form 3150 1/01   (Page 1 of 3)
EC025L  Rev. 11/13/00



CFN 891666 OR BK 2671 PG 3649

0144835238

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender required insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

MULTISTATE PUD RIDER
Single Family - FNMA/FHLMC Uniform Instrument

Form 3150 1/01   (Page 2 of 3)
EC025L Rev. 11/13/00

CFN 891666 OR BK  2671  PG  3650

0144835288

F. Remedies. If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.

_____ (Seal)
BARBARA ANN KELLY                -Borrower

_____ (Seal)
GREGORY B MYERS                  -Borrower

MULTISTATE PUD RIDER
Single Family - FNMA/FHLMC Uniform Instrument

Form 3150 1/01   (Page 3 of 3)
EC025L  Rev. 11/13/00

CFN 891666 OR BK 2671 PG 3651

## ADJUSTABLE RATE RIDER

0144535289

(1-Year Treasury Index-Rate Caps)
(Assumable after Initial Period)

This Adjustable Rate Rider is made this 25th day of MAY, 2005........................., and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure the Borrower's Adjustable Rate Note (the "Note") to ....................................................... WELLS FARGO BANK, N.A. ............................................................................................................... (the "Lender") of the same date and covering the property described in the Security Instrument and located at: 147 SILVER LAUREL WAY, SANTA ROSA BEACH, FL 32459......................................................
(Property Address)

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an Initial Interest Rate of ..5.625.... %. The Note provides for changes in the interest rate and the monthly payments as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The Interest Rate I will pay may change on the first day of JUNE, 2015..............................., and may change on that day every ..12. th month thereafter. Each date on which my interest rate could change is called an "Interest Change Date".

**(B) The Index**

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

ADJUSTABLE RATE RIDER-1-Year Treasury Index (Assumable after Initial Period)

page 1

10409A Rev. 03/30/05

CFN 891666 OR BK  2671  PG  3652

**(C)  Calculation of Changes**

0144635299

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding two and three-quarters percentage points(s) ( 2.750%)..............................to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be the new interest rate until the next Interest Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Interest Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Interest Change Date will not be greater than __10.625__ % or less than __2.750__ %. Thereafter, my interest rate will never be increased or decreased on any single Interest Change Date by more than **two percentage points(s) ( 2.000%)** from the rate interest I have been paying for the preceding 12 months. My interest rate will never be greater than __10.625__ %

**(E) Effective Date of Changes**

My new interest rate will become effective on each Interest Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

*page 2*

IOOMC Rev. 03/30/06

CFN 891666 OR BK 2671 PG 3653

0146635297

**TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Section 18 of the Security Instrument is amended to read as follows:

**1. UNTIL MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT IS DESCRIBED AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.**

As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**2. AFTER MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION B1. ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL INSTEAD BE DESCRIBED AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.**

As used in this section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Legibility Unsatisfactory
For Photostatic

Initials: [signature]          page 3          1002RM          REV 22617/05

[signature]

CFN 891666 OR BK  2671  PG  3654

0144635299

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
BARBARA ANN KELLY                        -Borrower


_____ (Seal)
GREGORY B MYERS                          -Borrower

Page 4

1000BG  Rev. 03/26/05

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

BARBARA ANN KELLY and
GREGORY BRIAN MYERS

  VS           CASE NO.  3:11cv252-MCR/EMT

REGIONS BANK

## JUDGMENT

  This action came before the Honorable M. Casey Rodgers and a decision has been rendered.

  Final judgment is entered in favor of Defendant, REGIONS BANK and against Plaintiffs, BARBARA ANN KELLY and GREGORY BRIAN MYERS for the total amount of $580,325.22, which consists of $326,879.74 due on the Home Equity Line of Credit Agreement ("HELOC"), plus $11,843.98 as costs and $241,601.50 as attorneys' fees due pursuant to the HELOC.

  Remaining costs to be taxed against Plaintiffs.

           JESSICA J. LYUBLANOVITS
           CLERK OF COURT

February 27, 2014     /s/Donna Bajzik
DATE         Deputy Clerk: Donna Bajzik

CERTIFIED A TRUE COPY
Jessica J. Lyublanovits

By: _____
   Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

BARBARA ANN KELLY &
GREGORY BRIAN MYERS,

      Plaintiff,

vs.                             CASE NO. 3:11cv252-MCR-EMT

REGIONS BANK,

      Defendants.

_____/

## TAXATION OF COSTS BY CLERK

    Judgment was entered in favor of the Defendant and against Plaintiff in the above entitled

action on February 27, 2014. A Bill of Costs (doc. 189) by Defendant was filed, with no

objections filed by Plaintiff. The undersigned hereby taxes costs as follows in accordance with

this court's administrative order dated September 21, 2004 titled "Allowable Items in Taxation of

Cost:"

| | |
|---|---|
| Fees of the Clerk | $0.00 |
| Fees for service of summons and subpoena | $120.00 |
| Fees for printed or electronically recorded transcripts necessarily obtained for use in the case | $2,286.50 |
| Fees and disbursements for printing | $0.00 |
| Fees for witnesses | $0.00 |
| Fees for exemplification and the cost of making copies of any materials where the copies are necessarily obtained for use in the case | $0.00 |
| Docket fees under 28 USC 1923 | $0.00 |
| Costs as shown on Mandate of Court of Appeals | $0.00 |
| Compensation of court-appointed experts | $0.00 |
| Compensation of interpreters and costs of special interpretation services under 28 USC 1828 | $0.00 |

CERTIFIED A TRUE COPY
Jessica J. Lyublanovits

By: _____
Deputy Clerk

| Other costs | $0.00 |
|---|---|
| **TOTAL COSTS TAXED** | **$2,406.50** |

In accordance with the above, costs are hereby taxed against Plaintiff in the amount of $2,406.50 for all of which sum let execution issue, and made a part of the Judgment entered on February 27, 2014.

Done this 20th day of June, 2014, at Pensacola, Florida.

JESSICA J. LYUBLANOVITS
CLERK OF COURT

By:   _s/ Travis D. Green_
Resident Deputy-in-Charge
Pensacola Division

2

# Exhibit D

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

BARBARA ANN KELLY and
GREGORY BRIAN MYERS

     VS                              CASE NO.  3:11cv252-MCR/EMT

REGIONS BANK

### JUDGMENT

    This action came before the Honorable M. Casey Rodgers and a decision has been rendered.

    Final judgment is entered in favor of Defendant, REGIONS BANK and against Plaintiffs, BARBARA ANN KELLY and GREGORY BRIAN MYERS for the total amount of $580,325.22, which consists of $326,879.74 due on the Home Equity Line of Credit Agreement ("HELOC"), plus $11,843.98 as costs and $241,601.50 as attorneys' fees due pursuant to the HELOC.

    Remaining costs to be taxed against Plaintiffs.

                       JESSICA J. LYUBLANOVITS
                       CLERK OF COURT

February 27, 2014          /s/Donna Bajzik
DATE                       Deputy Clerk: Donna Bajzik

CERTIFIED A TRUE COPY
Jessica J. Lyublanovits

By: _____
           Deputy Clerk

Case 3:11-cv-00252-MCR-EMT   Document 210   Filed 06/20/14   Page 1 of 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

BARBARA ANN KELLY &
GREGORY BRIAN MYERS,

       Plaintiff,

vs.                              CASE NO. 3:11cv252-MCR-EMT

REGIONS BANK,

       Defendants.

_____/

### TAXATION OF COSTS BY CLERK

       Judgment was entered in favor of the Defendant and against Plaintiff in the above entitled

action on February 27, 2014. A Bill of Costs (doc. 189) by Defendant was filed, with no

objections filed by Plaintiff. The undersigned hereby taxes costs as follows in accordance with

this court's administrative order dated September 21, 2004 titled "Allowable Items in Taxation of

Cost:"

| | |
|---|---|
| Fees of the Clerk | $0.00 |
| Fees for service of summons and subpoena | $120.00 |
| Fees for printed or electronically recorded transcripts necessarily obtained for use in the case | $2,286.50 |
| Fees and disbursements for printing | $0.00 |
| Fees for witnesses | $0.00 |
| Fees for exemplification and the cost of making copies of any materials where the copies are necessarily obtained for use in the case | $0.00 |
| Docket fees under 28 USC 1923 | $0.00 |
| Costs as shown on Mandate of Court of Appeals | $0.00 |
| Compensation of court-appointed experts | $0.00 |
| Compensation of interpreters and costs of special interpretation services under 28 USC 1828 | $0.00 |

CERTIFIED A TRUE COPY
Jessica J. Lyublanovits

By: _____
Deputy Clerk

| Other costs | $0.00 |
|---|---|
| **TOTAL COSTS TAXED** | **$2,406.50** |

In accordance with the above, costs are hereby taxed against Plaintiff in the amount of

**$2,406.50** for all of which sum let execution issue, and made a part of the Judgment entered on

February 27, 2014.

Done this 20th day of June, 2014, at Pensacola, Florida.


JESSICA J. LYUBLANOVITS
CLERK OF COURT

By:     *s/ Travis D. Green*
Resident Deputy-in-Charge
Pensacola Division

2